UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| YAKIMA VALLEY MEMORIAL HOSPITAL, a Washington Nonprofit Corporation, | NO. CV-09-3032-EFS |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |
| v. | |
| WASHINGTON STATE DEPARTMENT OF HEALTH; MARY C. SELECKY, in her official capacity as Secretary of the Washington State Department of Health, | |
| Defendants. | |

A hearing occurred in the above-captioned matter on December 16, 2009 in Yakima. James L. Phillips appeared on Plaintiff Yakima Valley Memorial Hospital's ("YVMH") behalf; Michael S. Tribble appeared for Defendants Washington State Department of Health ("Department") and Secretary Mary C. Selecky. Before the Court was Defendants' Motion for Judgment on the Pleadings. (Ct. Rec. 31.) For the reasons given below, the Court grants Defendants' Motion and dismisses YVMH's claims.

**I. Background**

YVMH sues to enjoin enforcement of the Department's Certificate of Need ("CON") regulations that restrict the number of hospitals that can perform elective percutaneous coronary intervention ("PCI"). The Department first issued the challenged regulations under a Washington

ORDER * 1

statute that was passed in response to the National Health Planning and Resource Development Act ("NHPRDA").

**A.    NHPRDA**

In 1974, Congress passed the NHPRDA, which required states to enact CON laws in order to receive federal health care funding. Pub. L. No. 93-641, 88 Stat. 2225 § 1523 (1975). CON laws empower State health agencies to determine the need for certain health services in each geographic area and license only needed services. Specifically, CON laws "provide for the review of and determination of need for . . . offerings of new institutional health services." *North Carolina v. P.I.A. Asheville, Inc.*, 722 F.2d 59, 62 (4th Cir. 1983). Congress's aim in passing the NHPRDA was to limit costs by preventing needless duplication of services and remedy uneven health care distribution. *Id.* at 61.[1]

This aim was not achieved. Congress repealed the NHPRDA in 1986. Pub. L. No. 99-660; 110 Stat. 3743, 3799 § 701 (1986). Repeal meant that states were no longer required to have CON laws in order to receive federal health care funding.

**B.    Washington State CON Laws and Regulations**

The Washington legislature passed a CON law in 1979, when the NHPRDA was still in effect. RCW 70.38. Washington's law required CON's for any "tertiary health service," or a "specialized service that meets complicated medical needs of people and requires sufficient patient volume to optimize provider effectiveness, quality of service, and improved outcomes of care." RCW 70.38.105(4)(f). This includes PCI. WAC

---

[1] Congress passed the NHPRDA out of concern that the market had failed to accomplish this on its own. *Id.*

ORDER * 2

246-31-700. In response, the Department adopted PCI CON regulations, WAC 246-310-700 – 246-315-755, among which are the regulations that YVMH challenges.

PCI, commonly known as coronary angioplasty or more simply angioplasty, is a non-surgical treatment for coronary heart disease. PCI involves removing arterial plaque, thereby clearing out obstructed coronary arteries and ameliorating the effects of heart disease. The category includes several different procedures, but PCI always involves inserting some device into the coronary artery to remove plaque. Elective PCI's are performed when the patient is stable and no medical emergency requires immediate action.

Section 246-31-745 sets the standards for granting elective PCI CON licenses to hospitals. First, the Department must estimate the number of elective PCI procedures that will be performed each year in a geographic planning area. To do this, it determines the area's use rate, which is the number of PCI's performed on persons over fifteen years old per 1000 persons. The use rate is then multiplied by an estimate of the area's population in that area for each year five years into the future.

The Department grants a new CON license if the estimated future need is substantially greater than licensed providers' capacity to perform elective PCI's ("net need"). But the Department does not grant a new PCI CON just because there is a net need in the planning area. A new provider must perform a minimum of 300 PCI's per year. WAC 246-310-720. Therefore, the difference between current capacity and projected demand must exceed 300 for a new provider to receive a CON license. WAC 246-310-745(10) Step 4. If the difference is greater than 300, the Department divides the difference by 300 and rounds down to determine the additional need. WAC

ORDER * 3

246-310-745(10) Step 5. To illustrate, even if the difference is 575, or almost enough for two additional PCI programs, only one additional program will be licensed because 575 divided by 300 is not quite two.

**C.    YVMH's Claims**

YVMH challenges three aspects of the PCI CON regulations. First, it takes issue with the definition of current capacity as the sum of all PCI's performed by providers that have CON approval. Defining current capacity in this way gives licensed hospitals a permanent franchise to perform elective PCI's. These hospitals can continue expanding their PCI capacity to ensure net need never arises in the planning area. Second, it challenges the calculation method for granting additional PCI's, which requires a full 300 additional net needed procedures before another CON will be granted in a planning area. Rounding down underestimates the need for PCI programs. Third, it asserts that the 300 annual PCI minimum volume requirement is arbitrary because cardiologists agree that the appropriate annual minimum is 200.

YVMH brings two claims against Defendants. First, YVMH claims that the regulations violate the Sherman Anti-trust Act because they restrain competition by limiting the number of PCI providers. This injures consumers and hinders commerce. YVMH alleges that the state does not monitor or actively supervise the operation of these regulations so they are not protected by the state immunity doctrine. (Ct. Rec. 1 at 7.) Second, according to YVMH, the CON regulations violate the dormant Commerce Clause under the test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), because the regulations' burdens on interstate commerce outweigh their putative local benefits. (Ct. Rec. 1 at 6.)

## II. Discussion

**A.   Standard**

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is appropriate after the pleadings are closed. Although Defendants style their motion under Rules 12(b)(6) and 12(c), Defendants already filed an answer without asserting the defenses in this motion. Therefore, a Rule 12(b)(6) motion is barred in this case, and this is a motion for judgment on the pleadings under Rule 12(c). *See* Fed. R. Civ. P. 12(b).

In a motion for judgment on the pleadings, a court may consider only legal issues. *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., Ltd.*, 132 F.3d 526, 528 (9th Cir. 1997). Material facts must be viewed in the light most favorable to the non-moving party, in this case, YVMH. *McGann v. Ernst & Young*, 102 F.3d 390, 392 (9th Cir. 1996). The court will grant a motion for judgment on the pleadings if the moving party can show a clear right to judgment as a matter of law from the face of the pleadings. *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1229 (9th Cir. 1996).

**B.   Motion to Supplement**

After this motion was argued and submitted, YVMH moved to supplement its response with two expert reports. The Court declines to consider those reports at this time for two reasons. First, it would prejudice Defendants to consider them without converting this motion into a motion for summary judgment. Fed. R. Civ. P. 12(d). Second, the Court does not find the expert reports helpful in clarifying the legal issues in the case. Although YVMH claims they explain the anti-trust and dormant

commerce clause violations, they appear to assert policy arguments against PCI CON laws. YVMH's motion is denied.

**C.   Analysis**

   **1.   Anti-trust**

YVMH asserts that the challenged regulations violate the Sherman Anti-trust Act by enabling hospitals that already have PCI CON licenses to perpetuate their elective PCI monopoly. Additionally, rounding down the estimated need serves no purpose other than to underestimate the number of required procedures, which artificially inflates prices. Finally, the regulation setting the minimum volume requirement at 300 is irrational and experts agree that the appropriate minimum volume requirement is 200 annual PCI's.

Defendants argue that the challenged regulations are actions of the State as sovereign, and as such are immune from anti-trust liability. Although the regulations have anti-competitive effects, Defendants say those effects are part of the State-designed system and the regulations delegate no market power to private parties.

Generally speaking, restraints of trade imposed directly by States are immune from anti-trust liability. *See Parker v. Brown*, 317 U.S. 341, 350-52 (1943) ("an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress"). This immunity extends to the acts of the State executive branch, including administrative agencies such as the Department. *Deak-Perera Hawaii, Inc. v. Dep't of Transp.*, 745 F.2d 1281, 1283 (9th Cir. 1984).

State restraints of trade are divided into two categories: unilateral and hybrid. *See Fisher v. City of Berkeley*, 475 U.S. 260, 267-68 (1986). Hybrid restraints are not immune from anti-trust

ORDER * 6

liability. Restraints are hybrid when the State "merely enforces private marketing decisions," thereby granting private actors "a degree of private regulatory power." *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 345 n.8 (1987) (citations omitted); *Fisher*, 475 U.S. at 268 (citing *Rice v. Norman Williams Co.*, 458 U.S. 654, 665 (1982)). But just because a law has anti-competitive effects that private parties acting in concert could not produce without violating the anti-trust laws does not mean it is hybrid. *See Fisher*, 475 U.S. at 266; *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 889 (9th Cir. 2008); *Mass. Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n*, 197 F.3d 560, 565 (1st Cir. 1999). The law must actually sanction an arrangement between private parties that unlawfully restrains competition. *Sanders v. Brown*, 504 F.3d 903, 915 (9th Cir. 2007).

In contrast, restraints are unilateral and immune from anti-trust challenge when they do not delegate any market authority to private actors. A unilateral restraint's anti-competitive effects are the result of the State's regulation, not of State sanction of private violations. *See Fisher*, 475 U.S. at 266–67; *Costco*, 522 F.3d at 887.

YVMH's assertion that the restraint is hybrid need not be accepted as true at this stage. Because this is a legal conclusion, not a factual assertion, the Court does not automatically take it to be accurate. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–52 (2009); *Point Ruston, LLC v. Pac. Nw. Reg'l Council of the United Bhd. Of Carpenters & Joiners of Am.*, 658 F. Supp. 2d 1266, 1273 (W.D. Wash. 2009).

YVMH makes three arguments that the challenged CON regulations are hybrid. First, YVMH claims that the licensing scheme gives licensed hospitals a local monopoly. This permits them to set prices without any

ORDER * 7

supervision or control by the State. Second, based on *Hertz Corp. v. City of New York*, 1 F.3d 121 (2d Cir. 1993), YVMH argues that the regulation's anti-competitive effects render it hybrid. Third, YMVH asserts that the State delegated market authority to hospitals with CON licenses because they have the ability to perpetuate their local monopolies.

These arguments are unpersuasive. First, a regulation that enables private actors to enjoy a monopoly is not necessarily a hybrid restraint. Although allowing only certain hospitals to perform elective PCI's might drive up cost by limiting supply and inhibiting competition, a regulation's anti-competitive effects are insufficient to render it hybrid. Those anti-competitive effects are not the result of private action or collaboration given the State seal of approval, but are contemplated by the State's licensing scheme. *Cf. Costco*, 522 F.3d at 890 (holding that a scheme that enabled price collusion among private actors was hybrid).

The cases YVMH cites for contrary authority are inapplicable. In *Miller*, the Ninth Circuit considered a statute whereby the State allowed liquor companies to set their own prices and then required them to keep those prices. 813 F.2d 1344. The court found the regulations compelled private parties to exchange price information and to fix prices without State review. *Id.* at 1349–51. Such private collaboration is not protected by the state immunity doctrine. In contrast, the regulations in this case have incidental anti-competitive effects that are not caused by private action. Rather, the State limits the number of hospitals that may perform the procedures, which makes the procedures pricier. There is no private collusion at all, only a State-granted monopoly.

ORDER * 8

Second, to the extent *Hertz* is persuasive authority in this Circuit, its logic is questionable because it is irreconcilable with Supreme Court decisions. In *Hertz*, the Second Circuit held that a New York City ordinance that prohibited rental car companies from charging renters more based on the city of their residence was a hybrid restraint. 1 F.3d at 127. The *Hertz* court reasoned that the ordinance was unlike rent control because it was not a regulatory scheme, there was no independent regulatory board to adjust rates, and it addressed an issue less central to municipal authority than housing.[2] *Id.* The Second Circuit also noted several "anticompetitive risks" identified in Supreme Court cases, including the city's ability to impose extra-territorial costs on the industry and obstruction of regional efficiency by distorting local markets. 1 F.3d at 127.

The Court respectfully disagrees with the Second Circuit's decision in *Hertz*. In light of *Fisher*, the Second Circuit's logic in *Hertz* is unpersuasive because it focused on a law's anti-competitive risks rather than delegation of market authority to private actors. The ordinance in *Hertz* was unilaterally imposed by the local government. Although any regulation might distort the market, such distortions are insufficient to make a restraint hybrid. *See Fisher*, 475 U.S. at 266. To be hybrid, a restraint must give direct market authority to private parties. Therefore, *Hertz* does not help YVMH's cause.

---

[2] Notably, the Supreme Court in *Fisher* did not rely on any of those factors when it concluded that rent control is a unilateral restraint. 475 U.S. at 266–70.

ORDER * 9

YVMH's third argument is more nuanced. YVMH argues that the Department does not grant a CON approval unless there is a net need for elective PCI procedures in a geographic area. In order for there to be a net need, the projected demand for these procedures must exceed the existing providers' capacity to perform them. But by performing procedures on individuals from outside the area, a hospital with a PCI CON license can increase its capacity to ensure local net need never arises. Therefore, although the local monopoly theoretically could end when local need outstrips licensed hospitals' ability to satisfy local PCI needs, in practice it never will because the monopolistic hospital can keep expanding its capacity.

To put it differently, YVMH argues that the regulations permit private actors to control markets. Hospitals with a PCI CON licenses can manipulate their PCI capacity to prevent others from intruding on their monopoly.

This argument ultimately does not persuade the Court. Several Ninth Circuit opinions have rejected anti-trust challenges to State-created local monopolies. *See*, *e.g.*, *A-1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333 (9th Cir. 1996); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869 (9th Cir. 1987)**;** *Deak-Perera*, 745 F.3d 1281. These opinions did not address whether the regulations were unilateral or hybrid, but they recognized that when the State deliberately creates a monopoly it is immune from anti-trust law. Defendants point out that Washington's PCI CON laws permit temporary monopolies that might open if there is enough net need. The greater power of creating a permanent local monopoly, repeatedly validated by the Ninth

Circuit, necessarily encompasses the lesser power of creating a local monopoly that may or may not be permanent.

None of the challenged regulations delegates any market power to private actors. The definition of current capacity comes directly from the State's regulation. It guarantees that hospitals with a PCI CON license may perform all the PCI's they can, but that is part of the regulatory design. YVMH takes issue with the possibility that licensed hospitals will keep expanding their capacity and crowd out intruders, but the State granted them an initial license and expected they could perpetuate their monopoly in that way. *Costco*, 522 F.3d at 890. The minimum volume requirement and rounding down are internal calculation methods the Department uses. Although they may restrict competition, and may even be unwise policy, that does not make them unlawful. They are directives from the State. Whatever anti-competitive effects the regulations may have were part of the State's design. Therefore, the regulations are unilateral and immune from anti-trust law, and YVMH's anti-trust claim is dismissed.[3]

---

[3] *See Gen. Hosps. Of Humana, Inc. v. Baptist Med. Sys., Inc.*, No. LR-C-84-455, 1986 WL 935 (E.D. Ark. Feb. 12, 1986) (holding that private health care providers proceeding under CON licenses are immune from anti-trust liability under the state action doctrine); *Trident Neuro-Imaging Lab. v. Blue Cross & Blue Shield of S.C., Inc.*, No. 81-1639-1, 1982 WL 1955, at *6 (D.S.C. Nov. 2, 1982) (concluding that a State health agency charged with health planning activities under a State statute benefits from state action anti-trust immunity).

ORDER * 11

### 2.    Dormant Commerce Clause

The language of the Commerce Clause does not explicitly limit the States' power over interstate commerce.[4] Nevertheless, it is well established that the Commerce Clause contains a negative or dormant aspect that limits the States' ability to regulate interstate trade. *See*, *e.g.*, *Dennis v. Higgins*, 498 U.S. 439, 446 (1991). The Supreme Court repeatedly held that States may not enforce laws that either 1) discriminate between in-state and out-of-state entities to protect in-state economic interests or 2) incidentally burden interstate commerce more than they benefit local interests. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); *Pike*, 397 U.S. at 142. Like so many rules in constitutional law, the dormant Commerce Clause has a number of exceptions, however. Defendants argue that YVMH lacks standing to sue for dormant Commerce Clause violations and that the challenged regulations are immune from Commerce Clause scrutiny because they were authorized by Congress.

### a.    Standing

Defendants argue that YVMH lacks standing to bring a dormant Commerce Clause claim for four reasons. First, YVMH has not pled its participation in interstate commerce. Second, YVMH cannot assert third-party standing in this case. Third, YVMH has not been harmed by a law that treats out-of-state companies differently from in-state companies.

---

[4] "The Congress shall have Power. . . To regulate Commerce with foreign Nations, among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8.

ORDER * 12

Finally, YVMH's operations in other states have not been harmed by these regulations because YVMH has no operations in other states.

To sue in federal court, a plaintiff must have standing, including both constitutional and prudential components. *See On the Green Apartments L.L.C. v. City of Tacoma*, 241 F.3d 1235, 1239 (9th Cir. 2000). To have constitutional standing, the plaintiff must have suffered an injury that is redressable by a favorable outcome. *Id.* Defendants do not argue that YVMH lacks constitutional standing. Indeed, YVMH has suffered financial injury because the challenged regulations prevent YVMH from performing elective PCI.

Defendants contest YVMH's prudential standing. In order to have prudential standing to sue for constitutional violations, the complaint must fall within the "zone of interests" protected by the constitutional provision at issue, in this case the Commerce Clause. *Id.* (citing *Individuals for Responsible Gov't, Inc. v. Washoe County*, 110 F.3d 699 (9th Cir. 1997)). The zone of interests is defined differently if the dormant Commerce Clause challenge is a facial challenge or one based on *Pike*.

The Fifth Circuit articulated this distinction nicely in *National Solid Waste Management Association v. Pine Belt Regional Solid Waste Management Association*, 389 F.3d 491 (5th Cir. 2004). In that case, a regional waste management authority required the residents of counties in the authority's service area to dispose of their trash at sites owned by the authority. *Id.* at 493. The Fifth Circuit held that the plaintiffs lacked standing to sue for a facial challenge because they did not allege that they intended to ship waste from out of state into the region. *Id.* at 499–500. However, the court found the plaintiffs had prudential

ORDER * 13

standing to challenge the regulations under *Pike* because they claimed they operated in interstate commerce and alleged that the challenged ordinance burdened their interstate business. *Id.* at 500-01.

Similarly, the Ninth Circuit held that it is the interested claimed, not the harm claimed, that matters for purposes of determining prudential standing to sue under the dormant Commerce Clause. *City of Los Angeles v. County of Kern*, 581 F.3d 841, 847-48 (9th Cir. 2009). In *County of Kern*, a waste-disposal company wanted to ship waste inside its home State but was discouraged from doing so by a statute that made it more expensive. The court held that the company did not have standing even though the increased cost would force it to ship waste out of state. *Id.* Only the harm (having to ship to out-of-state waste disposal sites), and not the interest (maintaining its in-state shipment), was out of state. In order for the company to have had standing, it would have had to claim that the regulations thwarted some actual or potential interstate operation.

The Court concludes that YVMH has prudential standing to sue for the alleged violations. The Complaint adequately alleges that the challenged regulations burden YVMH's interstate business. Specifically, YVMH alleges that if it were allowed to perform elective PCI's, it would 1) provide elective PCI to out-of-state residents; 2) buy necessary PCI equipment from out-of-state vendors; and 3) recruit physicians and staff from outside Washington to perform PCI. (Ct. Rec. 1 at 6.) If these facts are true, the Department burdened YVMH's interest in participating in interstate commerce. *Cf. Oregon v. Heavy Vehicle Elec. License Plate, Inc.*, 157 F. Supp. 2d 1158, 1169-70 (D. Or. 2001) (holding that State restrictions on electronic license plates might constitute an undue

burden on interstate commerce so the claim fell within the zone of interests protected by the dormant Commerce Clause). YVMH need only plead that it has interstate commercial interests that are burdened by the challenged regulations. *County of Kern*, 581 F.3d at 847–48; *Pine Belt*, 389 F.3d at 501; *see also Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 321 n.3 (1977) (holding that stock exchanges asserting their rights to engage in interstate commerce free of discriminatory taxes are within the zone of interests protected by the Commerce clause). This it has done. It pled that it operates in interstate commerce and those operations would include PCI if not for the CON regulations.

Defendants' argument under *On the Green* is misguided. In that case, the plaintiff, an apartment-complex operator, challenged a local ordinance that required a city utility to collect waste from all businesses and residents in the city and dispose of it in a city-owned landfill. 241 F.3d at 1237. The Ninth Circuit held that the plaintiff lacked standing. *Id.* at 1239–40. Its only grievance was that it was forced to pay for services that it wished to perform itself. It had no plans to ship waste across state lines, and did not allege that its interstate commercial activities were burdened in any way. *Id.* As a result, the injury it claimed was only "marginally related to the purposes implicit in the dormant Commerce Clause." *Id.* at 1240 (citing *Individuals for Responsible Gov't, Inc.*, 110 F.3d 699). By negative inference, had the plaintiff pled the ordinance burdened specific interstate contracts, it would have had standing. The apartment operator in *On the Green* was indistinguishable in relevant respects from the trash hauler in *County of Kern*. Neither had any plans to engage in interstate commerce that were burdened by the challenged regulation. 581 F.3d at

ORDER * 15

847; 241 F.3d at 1239-40. In contrast, YVMH pled that it has an actual interest in contracts with out-of-state medical suppliers, physicians, and potential PCI patients. The challenged regulations make it impossible for those contracts to come to fruition. Further, YVMH is not asserting a third party's rights, but its own frustrated rights to participate in interstate commerce. Accordingly, YVMH has standing under the dormant Commerce Clause.

### b. Congressional Authorization

Defendants argue that the 1974 NHPRDA authorized Washington's CON statute, under which the Department issued the challenged regulations. According to Defendants, because Congress authorized the regulations, they are not subject to attack under the dormant Commerce Clause. Furthermore, Defendants say, the subsequent repeal of the NHPRDA did not repeal the authorization for CON statutes, but only removed the requirement that States have CON statutes if they wished to receive federal health care funding.

An otherwise unconstitutional State burden on interstate commerce is permissible if authorized by Congress. *Ne. Bancorp, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 511 U.S. 383, 408 (1994); *Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1179 (9th Cir. 1998). Congressional authorization for State burdens on interstate commerce must be very clear for the burden to survive dormant Commerce Clause scrutiny. *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992).[5] The language must indicate a desire

---

[5] The Supreme Court frequently has held that Congress did not state its intent to relieve a state action from the limits of the Commerce Clause sufficiently explicitly. *See*, *e.g.*, *South-Central Timber Dev.*,

ORDER * 16

to alter the limits of state power imposed by the Commerce Clause. *United States v. Pub. Util. Comm'n of Cal.*, 345 U.S. 295, 304 (1953). The State asserting Congressional authorization bears the burden of showing that Congress authorized the State action. *Id.*

Research revealed only one case addressing a dormant Commerce Clause challenge to a health care CON law. *See Walgreen Co. v. Rullan*, 405 F.3d 50 (1st Cir. 2005). That case did not discuss whether Congress authorized the CON statute through the NHPRDA, and the defendant-appellee Puerto Rico Health Department did not raise the defense in its brief. *See* 2004 WL 5661258.

---

*Inc. v. Wunnicke*, 467 U.S. 82, 90 (1984) (holding that a Congressional policy allowing vertical integration of logging on federal lands does not indicate that a similar policy is permissible on State lands); *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982) (holding that the Federal Power Act did not evince an intent to permit States to prohibit export of hydroelectric power out of state); *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 959-60 (1982) (reasoning that Congressional deference to States on water law does not indicate that Congress did not intend for the Commerce Clause to apply to State water regulations).

But Congress must authorize only the specific action, not the consequences of that action, in order to exempt it from liability under the dormant Commerce Clause. If the explicitly-authorized action has consequences that burden interstate commerce, it is immune from a dormant Commerce Clause challenge. *See Ne. Bancorp.*, 471 U.S. at 174-75.

ORDER * 17

The Court holds that the NHPRDA clearly authorized PCI CON regulations such as the one at issue. Although the NHPRDA did not explicitly say that it allowed the States to burden interstate commerce, it required states receiving federal funding to devise programs to ensure that "only those [health care] services, facilities, and organizations found to be needed shall be offered or developed in the State." Pub. L. No. 93-541, 88 Stat. 2225 § 1523(a). Through this mandate, Congress necessarily permitted and indeed encouraged some restrictions of interstate commerce. As YVMH complains, limiting the number of CON licenses burdens hospitals' interstate contracts. Hospitals that lack licenses would service out-of-state patients, purchase supplies from out-of-state companies, and recruit out-of-state physicians if they were allowed to perform those services. Because the natural result of the CON laws required by the NHPRDA is to burden interstate commerce, Congress authorized dormant Commerce Clause violations. *See Ne. Bancorp.*, 471 U.S. at 174-75; *White v. Mass. Council of Constr. Employers*, 460 U.S. 204, 213 (1983) (concluding that a federal program intended to encourage economic revitalization "affirmatively permit[ted] the type of parochial favoritism" promoted by a municipal order that required city-funded construction projects to be performed by a local work force).

Moreover, the Court is not convinced that repeal of the NHPRDA extinguished that authorization. YVMH has the burden of showing that Congress intended to revoke permission to burden interstate commerce when it repealed the NHPRDA. *See Cent. Valley Chrysler-Jeep v. Witherspoon*, 456 F. Supp. 2d 1160, 1185 (E.D. Cal. 2006). It did not meet that burden. Relying on Congress's CON law requirements, all states but one enacted CON laws after the NHPRDA. Lowell M. Zeta, *Fundamental First Steps Along*

ORDER * 18

*the Road to Health Care Reform: Eliminating the Bureaucratic Burdens of*
*Certificate of Need Programs and Embracing Market Competition to Improve*
*State Health Care Systems*, 41 Creighton L. Rev. 727, 731 (2008). When
Congress repealed the NHPRDA, it did not comment on all the CON
regulations then existing in a supermajority of States. Nor did Congress
revoke federal health care funding for States that had CON laws passed
in response to its mandate. Even after the repeal, thirty-six states and
the District of Columbia retained their CON laws and their federal
funding. *Id.* at 732. The Court infers from this that Congress continued
to approve of CON laws.

The scant legislative history of the repeal supports this inference.
President Reagan issued a statement when he signed the bill that repealed
the NHPRDA. He indicated that the federal government was withdrawing from
regulating an area in which it had caused considerable inefficiencies:

> It is also with great pleasure that I can finally lay to rest
> the Federal health planning authorities. I have sought their
> repeal since I assumed office. These authorities, while
> perhaps well-intentioned when they were enacted in the 1970s,
> have only served to insert the Federal government into a
> process that is best reserved to the marketplace.

Statement by President Ronald Reagan on Signing S. 1744, 22 Weekly Comp.
Pres. Doc. 1565 (Nov. 17, 1986). Notably, President Reagan did not say
that the States no longer had the power to regulate health care planning
when it impacted interstate commerce. Rather, the NHPRDA was repealed
because the *federal* government was ill equipped to impose such
requirements. The States still could individually decide whether to
require CON licenses or leave health care planning to the market. Taking
together the evidence of Congressional intent and the States' reliance
on the NHPRDA when they passed their CON laws, the Court concludes that

ORDER * 19

the repeal of the NHPRDA removed only the requirement and not the authorization for State CON laws.

Defendants met their burden of showing that Congress authorized Washington's PCI CON regulations. Those regulations are immune from dormant Commerce Clause scrutiny.[6]

### III. Conclusion

For the reasons given above, **IT IS HEREBY ORDERED**:

1. Defendants' Motion for Judgment on the Pleadings **(Ct. Rec. 31)** is **GRANTED**.

2. YVMH's Motion to Supplement **(Ct. Rec. 50)** is **DENIED**. The related Motion to Expedite **(Ct. Rec. 49)** is **GRANTED**.

3. The Clerk of the Court is **DIRECTED** to enter judgment in Defendants' favor on all claims.

4. This file shall be closed.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and distribute copies to counsel.

**DATED** this____25th_____ day of May 2010.


                         _____
                                   S/ Edward F. Shea
                               EDWARD F. SHEA
                         United States District Judge

_____

[6] Defendants also move to dismiss YVMH's "privileges and immunities" claim. However, as YVMH makes clear in its response, that is not a separate claim, but simply a rephrasing of its claim for attorney's fees and costs under the dormant Commerce Clause through 42 U.S.C. § 1983. As discussed above, the Court dismisses that claim, so further treatment of the so-called privileges and immunities claim is unnecessary.

ORDER * 20

1    Q:\Civil\2009\3032.JOP.wpd

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER * 21